**In re ALL KELLEY & FERRARO ASBESTOS CASES.**

[Cite as *In re All Kelley & Ferraro Asbestos Cases,*
153 Ohio App.3d 458, 2003-Ohio-3936.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

Nos. 78158, 78159, 78299, 78301, 80083, 80332, 80673 and 81576.

Decided July 24, 2003.

Kelley & Ferraro, L.L.P., Michael V. Kelley, John A. Sivinski and Thomas M. Wilson;  Hahn, Loeser & Parks and Robert J. Fogarty, for appellee.

The Zagrans Law Firm and Eric H. Zagrans; Mansour, Gavin, Gerlack & Manos, Jeffrey M. Embleton, Samuel R. Matillotta, Anthony J. Coyne and Eli Manos; Rubin & Rubin (Chartered), Ronald B. Rubin and Michael A. Stodghill; Shea & Gardner, Richard M. Wyner, William F. Sheehan, Michael K. Isenman, David P. Huitema and Jeffrey M. Klein; Coblence & Warner and Clinton B. Fisher, for appellants.

---

PATRICIA ANN BLACKMON, Judge.

{¶ 1} Kelley & Ferraro, L.L.P. ("K&F"), represented 15,000 asbestos plaintiffs who had sued various asbestos manufacturers and distributors in Cuyahoga County and other jurisdictions. On behalf of these plaintiffs, K&F entered into an agreement with the Center for Claims Resolution ("CCR") to settle these plaintiffs' claims against the CCR's members. These 10 consolidated appeals arise from the trial court's granting of six motions by K&F to enforce that agreement.

{¶ 2} K&F filed these motions to enforce the settlement agreement when the CCR failed to make full payments as scheduled under the agreement. CCR attributed the deficiencies to the failure of certain members to pay their shares. With each motion, the court ruled in favor of the plaintiffs against each and all of the CCR members. On appeal, the CCR members argue that the court erred in holding the CCR members jointly and severally liable to the plaintiffs. They also claim that the court lacked jurisdiction over the asbestos suits filed in other courts or over those CCR members who were not named in the underlying asbestos suits. Additionally, they contend that the plaintiffs' claims were barred by accord and satisfaction.[1]

{¶ 3} After reviewing the record and pertinent law, we affirm the judgments of the court. The apposite facts follow.

{¶ 4} The CCR is a nonprofit organization created in 1988 by asbestos producers and distributors to handle all asbestos-related personal injury litigation. On July 28, 1999, the CCR, acting on behalf of its member companies,[2] entered into a settlement agreement with K&F, which represented approximately

---

1. The assignments of error presented in these consolidated appeals are listed in an appendix to this opinion.

2. At the time the CCR entered into the settlement agreement with K&F, it had 19 members: Amchem Products, Inc., Armstrong World Industries, Inc., Asbestos Claims Management Corp., Certain Teed Corp., C.E. Thurston and Sons, Inc., Dana Corp., Ferodo America, Inc. (Formerly Nuturn Corp.), Flexitallic, Inc., GAF Corp., I.U. North American, Inc., Maremont Corp., National Service Industries, Inc., Nosroc Corp., Pfizer Inc., Quigley Co., Inc., Shook & Fletcher Insulation Co., T & N plc, Union Carbide Corp., and United States Gypsum Company.

15,000 asbestos plaintiffs, to settle the latter's claims against the CCR's member companies.

{¶ 5} Under the settlement agreement, the plaintiffs were to be paid an estimated $120 million[3] over time in 12 biannual installments between December 1999 and December 2004. Each installment payment was to cover a subgroup of those 15,000 plaintiffs represented by K&F.

{¶ 6} The relationships among the CCR members are governed by a Producer Agreement Concerning Center for Claims Resolution ("Producer Agreement"). Under this agreement, each member authorizes the CCR to act as its sole agent to handle all asbestos-related claims, including "settlement, payment or defense of all asbestos-related claims" against its members.[4]

{¶ 7} Furthermore, this agreement sets forth a complicated formula to calculate the members' shares for settlement amounts to be paid to the plaintiffs. It uses an intricate payment matrix and a lengthy set of rules that divides claimants into various occupational categories and groupings and classifies the asbestos producers and distributors into several tiers.

{¶ 8} In addition, under this agreement, all disputes among the members are to be resolved through alternative dispute resolution: Section 14 of the Producer Agreement, Paragraph 3, states:

{¶ 9} "All disputes concerning the validity, interpretation and application of the Agreement or any provision thereof, and all disputes concerning issues within the scope of the Agreement shall be resolved through alternative dispute resolution (ADR) * * *."

{¶ 10} Paragraph 4 of that section states:

{¶ 11} "In the event that any Participating Producer's percentage shares of liability payments or allocated expenses are not paid in a timely manner, the Center's Board of Directors may direct the Center to institute an ADR on behalf of the Center's Participating Producers against such Participating Producer to enforce payment of such obligations."

### 1. THE PROCEDURAL HISTORY

#### A. Appeal Nos. 78158, 78159, 78299, 78301 and 78314.

{¶ 12} As it did in other similar settlements across the country, one of the member companies, GAF Corporation, failed to submit its allocated payments to the CCR, apparently because it disputes the CCR's calculation of its share.

---

3. This amount is based on an estimate by plaintiffs' counsel of the number of plaintiffs that will qualify for payment in various disease categories.

4. Section IV of the Producer Agreement, Paragraph 1.

{¶ 13} As a result, the CCR did not make a full payment to K&F as scheduled in December 1999. Rather, on March 10, 2000, the CCR forwarded to K&F a payment deficient by $987,295.27 and informed the law firm that the deficiency was due to GAF's failure to pay its share.

{¶ 14} In response, K&F filed a motion on March 16, 2000, to enforce the settlement agreement.

{¶ 15} After a hearing, the trial court entered judgment against the CCR and its members in the amount of $987,295.27. The trial court's May 16, 2000 order stated:

{¶ 16} "The agreement which created the Center—the Producer's Agreement—provides for a complicated formula to assess the individual contributions of each member to the collective sums negotiated by the Center to settle the claims. The agreement also requires *all* internal disputes to be decided in an Alternative Dispute Resolution (ADR) proceeding. The agreement also guarantees confidentiality to each member as to the allocation of each member's responsibility to each plaintiff. Instead of proceeding to ADR when a dispute arose as to GAF's share, the Center elected, on March 10, to short the plaintiffs and to breach its covenant of confidentiality with GAF. The Center now seeks judgment from this court against GAF which, in effect, would hold GAF responsible for the shortfall. The court declines; this is an internal dispute over allocation and ADR will settle that issue.

{¶ 17} "The plaintiffs forsook their claims against the various members of the Center in exchange for the Center's promise to deliver certain sums on certain dates. It was left to the Center to collect the money and to remit it to plaintiffs; no shares or percentages were agreed to or assigned by the plaintiffs. A lump sum was due from the Center and its members, and that sum remains unpaid. Judgment is hereby entered for plaintiffs against CCR and each member named in the Settlement Agreement, including GAF, in the sum of $987,259.27 plus interest from 3/10/00."

{¶ 18} Thereafter, however, the court amended its order and vacated its judgment as to the CCR, but left intact the part of its judgment against each CCR member.

{¶ 19} On June 8, 2000, CCR forwarded to K&F its second scheduled payment, this time deficient by $2,210,154.62, again explaining the deficiency was because of GAF's failure to pay its share. The next day, K&F filed a second motion to enforce the settlement agreement. On June 15, 2000, GAF filed its notice of appeal in appeal No. 78157. On the same date, two separate notices of appeal were filed by the CCR members: a subgroup of the 18 remaining member companies, referring to themselves as "defendant members" of the CCR, filed

appeal No. 78158; another group of CCR members, referring to themselves as "nonparty members" of the CCR, filed appeal No. 78159.

{¶ 20} On June 29, 2000, the trial court granted the plaintiffs' second motion to enforce the settlement agreement, entering judgment in favor of the plaintiffs in the amount of $2,210,154.62. On July 13, 2000, defendant members and the nonparty members again filed separate notices of appeal from that judgment, in appeal Nos. 78299 and 78301, respectively. On July 14, 2000, GAF filed its own notice of appeal, in appeal No. 78314.

{¶ 21} Thereafter, we consolidated all six appeals for record, briefing, hearing, and disposition.

### B. Appeal Nos. 80083, 80332, 80673 and 81576.

{¶ 22} These four consolidated appeals stem from the CCR's failure to make full payments for the December 2000, June 2001, December 2001, and June 2002 installments.

{¶ 23} For the December 2000 installment, the CCR sent K&F a check with an underpayment of $4,669,474.71, which, according to the CCR, corresponded to the shares allocated to GAF and ACMC, which had both filed for bankruptcy by this time.

{¶ 24} For the June 2001 installment, the CCR sent a payment with a deficiency, which it claimed was due to the failure to pay by three bankrupt members, i.e., Armstrong, GAF, and ACMC.

{¶ 25} By the time the December 2001 installment became due, seven CCR members were in bankruptcy: GAF, ACMC, Armstrong, United States Gypsum Corporation, Turner & Newall, plc, Ferodo America, Inc., and Flexitallic, Inc. The CCR represented to K&F that these companies, as well as Shook & Fletcher Insulation Company, failed to pay their shares; instead of forwarding the payments it had collected from the nonbankrupt members, it sent correspondence to K&F, asking it to pursue either of the two remedies provided for in Paragraph 13 of the settlement agreement.[5] For the June 2002 payment, the CCR again sent a similar correspondence without forwarding any payment.

---

5. {¶ a} Paragraph 13 states:

{¶ b} "In the event that the CCR fails to make any of the payments pursuant to paragraph 5 because any one of the CCR member companies fails to make timely payment of its individual share of such payment when such payment has become due in accordance with all of the terms of this Settlement Agreement, including Appendix C (a 'Default'), Plaintiff Counsel shall have the option of either (a) declaring this Settlement Agreement null and void as against the Defaulting CCR member company only, with respect to any and all Plaintiffs whose claims have not at that time been paid by the CCR under paragraph 5 and Appendix C; or (b) declaring this Settlement Agreement null and void as against all CCR member companies with

{¶ 26} These events triggered the plaintiffs' fourth, fifth, sixth, and seventh motions to enforce the settlement agreement. As it had done on two earlier occasions, the trial court consistently entered judgments in favor of the plaintiffs for the amount of deficiencies. These rulings gave rise to appeal Nos. 80083, 80332, 80673, and 81576, which we consolidated with the first six appeals.[6]

{¶ 27} Thereafter, appeal Nos. 78157 and 78314, filed by GAF, were dismissed by G–I Holding, Inc., successor to GAF. Consequently, the appeals that remain to be reviewed are those appeals that were filed by the defendant members and nonparty members, i.e., appeal Nos. 78158, 78159, 78299, 78301, 80083, 80332, 80673, and 81576.

{¶ 28} Although the deficiencies which triggered the first two motions to enforce the settlement agreement are due to GAF's contesting its share, the deficiencies that triggered the fourth, fifth, sixth, and seventh motions were because of the bankruptcies of several member companies.

{¶ 29} The main issue to be resolved in all these appeals is whether the CCR members are jointly and severally liable to the plaintiffs under the settlement agreement.

## 2. THE JOINT AND SEVERAL LIABILITY ANALYSIS

■ {¶ 30} Appellant CCR members argue that the trial court erred in imposing joint and several liability on all CCR members for the deficiencies created by some members' failure to pay their shares. They argue that each member is responsible for its own share as calculated by the CCR, maintaining

---

respect to any and all Plaintiffs whose claims have not at that time been paid by the CCR under paragraph 5 and Appendix C. Plaintiff Counsel shall exercise either of these options by providing written notice to the CCR of their decision to do so within 90 days of notice to that Counsel of any CCR member company's failure to make timely payment of its share of any payment due under paragraph 5. In the event that Plaintiff Counsel chooses to exercise option (a) above, Plaintiff Counsel, the CCR, and the non-Defaulting CCR member companies shall remain bound by this Settlement Agreement, but any and all Plaintiffs whose claims have not been paid by the CCR under paragraph 5 and Appendix C as of the date of the Default shall be free either to bring suit to enforce the Defaulting CCR member company's obligations under this Settlement Agreement or to pursue their claims for asbestos-related bodily injury against the Defaulting CCR member company in the tort system. In the event that Plaintiff Counsel chooses to exercise option (b) above, any and all Plaintiffs whose claims have not been paid by the CCR under paragraph 5d and Appendix C as of the date of the Default shall be free to pursue their claims against any CCR member companies in the tort system. Plaintiffs that opt to bring suit in the tort system under either option (a) or option (b) above shall have one year from the date of the written notice of termination to file their claims in the tort system, unless the applicable law provides for a longer period of time."

6. On December 20, 2002, this court instructed the trial court not to undertake further proceedings in this case regarding enforcement of the settlement agreement until we dispose of these pending appeals.

that when a member company fails to pay its allocated share, the plaintiffs have the burden to pursue that company for the deficiency.

{¶ 31} K&F, on the other hand, argues that under the settlement agreement the CCR members are jointly liable to them for the total sum specified in the settlement agreement and an underpayment or nonpayment by a member is an internal matter to be resolved among the members themselves.

{¶ 32} Interestingly, both CCR members and K&F rely on a provision contained in the first sentence of Paragraph 13 of the settlement agreement. That sentence states:

{¶ 33} "Payments to Plaintiff Counsel by the CCR under paragraph 5 of the Settlement Agreement shall be funded by the CCR member companies in accordance with the terms of the Producer Agreement Concerning Center For Claims Resolution (as amended, effective February 1, 1994) and *each CCR member shall be liable under this Settlement Agreement only for its individual share as determined under that Producer Agreement.*" (Emphasis added.)

{¶ 34} As an initial matter, we note that "[a] trial court possesses the authority to enforce a settlement agreement voluntarily entered into by the parties to a lawsuit since such an agreement constitutes a binding contract."[7] In addition, as our court has stated, "a trial court possesses continuing jurisdiction to enforce and interpret the terms of a settlement agreement."[8] Similarly, in *Ohio State Tie & Timber, Inc. v. Paris Lumber Co.,*[9] the court explained that when the parties entered into a settlement of a case before the trial court, the trial court has jurisdiction to determine the terms of that agreement and to enforce it by judgment, because the agreement would constitute a contract in settlement of a pending Ohio case.[10]

{¶ 35} More specifically, the outcome of the instant appeal depends on whether we interpret the provision in Paragraph 13 of the settlement agreement to impose

---

7.  *Mack v. Polson Rubber Co.* (1984), 14 Ohio St.3d 34, 14 OBR 335, 470 N.E.2d 902, citing *Spercel v. Sterling Industries* (1972), 31 Ohio St.2d 36, 60 O.O.2d 20, 285 N.E.2d 324.

8.  *Cleveland v. Cleveland Bd. of Bldg. Stds. & Bldg. Appeals* (Sept. 11, 1997), Cuyahoga App. No. 71120, 1997 WL 566067, citing *Mack v. Polson Rubber Co.* (1984), 14 Ohio St.3d 34, 14 OBR 335, 470 N.E.2d 902.

9.  (1982), 8 Ohio App.3d 236, 240, 8 OBR 309, 456 N.E.2d 1309, reversed on other grounds, *Columbus Show Case Co. v. CEE Contracting, Inc.* (1992), 75 Ohio App.3d 559, 599 N.E.2d 881.

10. See, also, *Tepper v. Heck* (Dec. 10, 1992), Cuyahoga App. No. 61061, 1992 WL 369283 (when an action is dismissed pursuant to a stated condition, such as the existence of a settlement agreement, the court retains the authority to enforce such an agreement in the event the condition does not occur).

joint and several liability. As stated in Corbin on Contracts[11] in a discussion of joint and several liability in a contract:

{¶ 36} "In a modern court, administering a system of law based on equity as well as common law, * * * the main issue with respect to co-promisors is as to whether they promised only one performance or separate and distinct performances, and with respect to co-promisees is as to whether they were all promised one identical performance or a separate and distinct performance for each of them. This is the issue of which it is correct to say that it is determined by 'interpretation.'"

{¶ 37} Thus, the court has the power in the instant case to determine the nature of the appellant CCR members' liability by interpreting the terms of the settlement agreement. Our standard of review of this case is de novo. We perform a de novo review because the interpretation of written contracts is a question of law.[12]

{¶ 38} As our task here is one of interpretation, we begin with several well-established principles of contract interpretation. The cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties.[13] Furthermore, the intent of the parties is presumed to reside in the language they chose to employ in the contract.[14]

{¶ 39} "In construing a written instrument, effect should be given to all of its words if this can be done by any reasonable interpretation; and it is the duty of a court to give effect to all parts of a written contract, if this can be done consistently with the expressed intent of the parties. If possible, every provision in a contract should be held to have been inserted for some purpose and to perform some office, and an attempt must be made to harmonize, if possible, all the provisions of a contract."[15]

---

11. (Interim Ed.2002), Section 925.

12. *Sherman R. Smoot Co. of Ohio v. Ohio Dept. of Adm. Serv.* (2000), 136 Ohio App.3d 166, 172, 736 N.E.2d 69.

13. *Foster Wheeler Enviresponse v. Franklin Cty. Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 678 N.E.2d 519, citing *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 53, 544 N.E.2d 920.

14. *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 31 OBR 289, 509 N.E.2d 411.

15. *Ford Motor Co. v. John L. Frazier & Sons Co.* (1964), 8 Ohio App.2d 158, 161, 29 O.O.2d 379, 196 N.E.2d 335, quoting 11 Ohio Jurisprudence 2d (1955) 399, Contracts, Section 155. See, also, *Gibbons v. Metro. Life Ins. Co.* (1938), 62 Ohio App. 280, 15 O.O. 594, 23 N.E.2d 662, paragraph one of syllabus (in interpreting the meaning of a particular term of a contract, it is the duty of the court to take into consideration all of the provisions of the contract); Restatement of the Law2d, Contracts (1981), Section 202(5) (whenever reasonable, the

{¶ 40} "In harmonizing apparently conflicting clauses of a contract they must be construed so as to give effect to the intention of the parties as gathered from the whole instrument, and where the object to be accomplished is declared in the instrument, the clause which contributes most essentially to that object will control. So, anything in an agreement which in any way conflicts with the chief purpose therein must give way to the clause which makes the major intent effective."[16]

{¶ 41} Finally, we recognize that courts have expressed preference for an interpretation that will result in contract terms that are reasonable.[17]

{¶ 42} Here, the appellant CCR members, relying on the words "each CCR member shall be liable under this Settlement Agreement only for its individual share," argue that these words manifest the parties' intent to impose several liability on the member companies.

{¶ 43} On its face, this phrase appears to indicate several liability. However, meanings of words depend on their context—meanings are not "expressed and conveyed by separate, disconnected words placed in a row."[18] These words, therefore, cannot be read in isolation or disconnected from the words that surround them.[19] Rather, we must ascertain their meaning in the context of the sentence where they occur: "each CCR member shall be liable under this Settlement Agreement only for its individual share *as determined under [the] Producer Agreement*,"[20] as well as in the context of the entire settlement agreement.

---

manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other).

**16.** Id., citing 11 Ohio Jurisprudence 2d (1955) 381, Contracts, Section 135.

**17.** *Corbin on Contracts* (Rev.Ed.1998), Section 24.21, citing, e.g., *F.D.I.C. v. Prince George Corp.* (C.A.4, 1995), 58 F.3d 1041 (when one construction would render contract terms extraordinary or unusual and another construction equally consistent with the contract language would render it reasonable, fair, and just, this latter construction must prevail); *Stone v. Natl. City Bank* (1995), 106 Ohio App.3d 212, 665 N.E.2d 746 (cardinal principle of contract construction is to give reasonable effect to every provision in the agreement); *State Auto. Ins. v. Childress* (Jan. 15, 1997), Hamilton App. No. C–960376, 1997 WL 20936 (a court must determine whether the contract can be interpreted giving reasonable, lawful, effective meaning to all terms).

**18.** Corbin on Contracts (Rev.Ed.1998), Section 24.21.

**19.** See *Foster Wheeler,* supra, citing *New York Coal Co. v. New Pittsburgh Coal Co.* (1912), 86 Ohio St. 140, 167, 99 N.E. 198 (recognizing the maxim noscitur a sociis, that the meaning of words or provisions in a contract may be indicated or controlled by those with which they are associated).

**20.** Emphasis added.

{¶ 44} Furthermore, because that sentence in Paragraph 13 refers to the Producer Agreement, the document that governs the relationships among the CCR members, our interpretation of it must necessarily involve an understanding of the members' rights and obligations with respect to each other as defined by that agreement. Our analysis begins with the query: what was the bargain that the plaintiffs had with the CCR members in this settlement?

{¶ 45} Under the terms of the settlement agreement, the CCR was to pay plaintiffs an estimated $120 million to be paid in 12 biannual installments. In exchange, each of the 15,000 plaintiffs would extinguish all pending and future claims against each one of the 19 member companies. This sum is the only amount specified in the settlement agreement, and, therefore, the only amount bargained for by the plaintiffs. The members' individual shares toward this total are *not* part of the agreement between the plaintiffs and the CCR members.

{¶ 46} Instead, the settlement agreement leaves the matters of share allocation to be bargained among the CCR members themselves, by the employment of these words: "liable * * * only for its individual share as determined under [the] Producer Agreement." By these words, the settlement agreement defers to the Producer Agreement for a mechanism to calculate each member's proportionate obligation *vis-a-vis other members* toward the total sum owed to the plaintiffs. In fact, when we read this phrase in conjunction with the immediately preceding phrase, its import becomes even more apparent. The first sentence of Paragraph 13, states:

{¶ 47} "Payments to Plaintiff Counsel by the CCR under paragraph 5 of this Settlement Agreement shall be funded by the CCR member companies in accordance with the terms of the Producer Agreement Concerning Center For Claims Resolution (as amended, effective February 1, 1994) and each CCR member company shall be liable under this Settlement Agreement only for its individual share of such payments as determined under that Producer Agreement."

{¶ 48} The language used by the parties, i.e., "liable * * * only for its individual share," when read as a disjoined phrase, is suggestive of several liability. Under several liability, in the event that a member fails to pay its part for whatever reason, the plaintiffs would have the burden of establishing and recovering that amount in a court action. This burden on the plaintiffs cannot be harmonized with the other provisions in the settlement agreement or the Producer Agreement.

{¶ 49} First, the settlement agreement defers all share-of-payment disputes to the Producer Agreement. That agreement, in turn, requires all share-of-payment disputes to be arbitrated among the members; Section 14 of the Producer Agreement, Paragraph 3 provides that "[a]ll disputes concerning the validity,

interpretation and application of the Agreement or any provision thereof, and all disputes concerning issues within the scope of the Agreement shall be resolved through alternative dispute resolution (ADR)."

{¶ 50} Under several liability, however, a share-of-payment dispute among the members would *instead* be adjudicated in a court action, either as a tort or as a contract action, between the plaintiffs and the member who failed to pay its share. This blatantly contravenes the arbitration provision in the Producer Agreement. As K&F points out, to read the settlement agreement as imposing several liability amounts to taking the arbitration provision out of the Producer Agreement and foisting a dispute between the parties to the Producer Agreement onto the plaintiffs.

{¶ 51} Second, the only contractual amount specified in the settlement agreement is the amount collectively owed by the CCR members, i.e., $120 million. The settlement agreement states, in Paragraph 13, that this sum "*shall be funded by the CCR member companies* in accordance with the terms of the Producer Agreement." (Emphasis added.) This language indicates that the performance promised by the CCR members was not for each member company to individually pay the plaintiffs a certain sum of money; rather, what was promised was for the CCR members, as a group, to fund the contractual amount of $120 million. A several-liability interpretation is inconsistent with the import of this provision.

{¶ 52} Finally, as defined by the courts, several liability is "[l]iability *separate and distinct from liability* of another to the extent that an independent action may be brought without joinder of others."[21] Here, however, the plaintiffs *have to* join the other member companies in order to establish and recover in court the amount owed to them by any particular member company. This is because the percentage or share allocated to any particular member is contractually determined among the member companies and inherently tied to every other member's share. Every member's obligation is interrelated with those of other members, calculated by a formula agreed to by the members. Therefore, the plaintiffs cannot possibly prove in a tort or contract action the amount of liability owed by any particular CCR member company without joinder of the other CCR members.

{¶ 53} The following statements from the *appellants'* own brief underscore our interpretation of the rights and obligations of the parties in this settlement:

{¶ 54} "[T]he Claimants bargained for and expressly agreed to the provision in the Settlement Agreement delegating to the CCR the sole responsibility for determining its members' shares of the settlement. The Claimants agreed not to

---

**21.** (Emphasis sic.) *Wayne Smith Constr. Co. v. Wolman, Duberstein & Thompson* (1992), 65 Ohio St.3d 383, 604 N.E.2d 157, citing Black's Law Dictionary (5th Ed.1979), at 1232.

be part of that allocation process; the bargain they made does not reserve to them the right to allocate the payment shares of the Appellant Companies."[22]

{¶ 55} Therefore, a several liability interpretation of Paragraph 13, with its implication that the plaintiffs assume the burden to establish the share borne by a particular member, does not comport with the terms of the agreement reserving rights of share allocation to the members.

{¶ 56} In our effort to harmonize and to give reasonable effect to all provisions in the parties' agreement, we have concluded that the first sentence in Paragraph 13 of the settlement agreement, read in its entirety and in conjunction with other settlement provisions, imposes joint and several liability on the CCR members. Instead of reading this sentence as defining the members' liability *to the plaintiffs*, as the CCR members propose, we read this sentence as defining the members' liability *vis-a-vis each other*. The CCR members could have easily made themselves "severally" bound to the plaintiffs by using that magic word, but they did not.[23] It is rather disingenuous for the CCR members, which are sophisticated business entities represented by able counsel, to now tout that sentence as manifestation of the parties' intent to create several liability, when that purported intent could have easily been expressed by the use of the words "severally liable."

{¶ 57} We recognize that it is not the province of the court to alter a contract by construction or to make a new contract for the parties; it is, however, our duty to interpret the one which they have made for themselves.[24] Here, we interpret the agreement to have manifested an intent to impose joint and several liability on the CCR members.

{¶ 58} Our interpretation of the agreement regarding the nature of the appellant CCR members' liability toward the plaintiffs also comports with our sense of fundamental fairness for the following reason:

{¶ 59} The parties do not dispute the total amount that the CCR members owe the plaintiffs under the settlement agreement. The only dispute is essentially who has the burden to recover a deficiency caused by a member company's failure to pay.

---

22. See the appellate brief submitted by "Eleven Appellant Companies" for Appeal Nos. 80083, 80332, and 80673, at 18.

23. See Corbin on Contracts (Interim Ed.2002), Section 925 (The "assumption" that the promisors mean to be bound "jointly" can easily be overcome by adding words of "severance").

24. See 17A Corpus Juris Secundum, Contracts (1999), Section 296.

{¶ 60} The CCR members maintain that because the members are severally liable, the plaintiffs themselves must seek that amount of deficiency from the nonpaying member. K&F argues that the CCR should make the scheduled payments regardless of nonpayment by a member and that the CCR members who have overpaid could then recover from the nonpaying member after arbitration conclusively settles any share-of-payment dispute, as required by the Producer Agreement. As we have noted, under the various provisions in the settlement agreement and the Producer Agreement, the CCR members are in a much better position than the plaintiffs to pursue a member company for any underpayment, either in court or in an arbitration proceeding. The plaintiffs cannot possibly prove any individual member's share: they were not part of the share-allocation process, nor do they have access to any information or data that were applied to the allocation formula to arrive at each member's proportionate liability. Therefore, under the guidance of fundamental fairness, we reach the same result of joint and several liability.

### 3. THE JURISDICTIONAL CLAIMS

{¶ 61} The six motions to enforce the settlement agreement that are the subject matter of the instant appeals were filed by K&F in response to its receipt of six deficient installment payments from the CCR. Each installment payment, under the settlement agreement, was to cover a different group of plaintiffs, who had each sued a different subgroup of the CCR members, only a portion of whom had sued in Cuyahoga County.

{¶ 62} CCR members maintain that each motion to enforce the settlement agreement therefore involves a different set of plaintiffs and consequently a different subgroup of CCR members.

{¶ 63} Based on that fact, CCR members objected to the court's authority to enter judgments against all the CCR members in enforcing the settlement agreement. First, they claim that the court lacked jurisdiction to adjudicate those underlying asbestos cases which had been filed in courts other than the Cuyahoga County court. Second, they argue that the court had personal jurisdiction over only those defendants who were sued or served with process by plaintiffs who had filed in this county.[25]

{¶ 64} " 'In order for a judgment to be rendered against a defendant when he is not served with process, there must be a showing upon the record that the

---

25. For this reason, in response to each judgment by the court rendered in this action, the CCR members filed two separate notices of appeal: one by the defendant members and one by the nonparty members.

defendant has voluntarily submitted himself to the court's jurisdiction or committed other acts which constitute a waiver of the jurisdictional defense.' "[26]

{¶ 65} "Voluntary participation in the litigation with a view to resolution of the dispute binds the parties so participating. The test of whether there is sufficient participation to constitute a voluntary appearance, aside from objecting to jurisdiction, appears to be whether by the acts done in relation to the litigation the party has sought to utilize the machinery of the court in some affirmative way to serve that party's ends in the resolution of the dispute."[27]

{¶ 66} A voluntary waiver may occur where a defendant fails to assert a challenge to personal jurisdiction at the first appearance in the case and move for dismissal, and thus is said to have consented to the jurisdiction of the court.[28]

{¶ 67} Here, at the very first hearing in the series of plaintiffs' motions to enforce the settlement agreement, which took place on May 2, 2000, Kathleen Pettingill entered an appearance on behalf of the CCR, without noting a special appearance.[29] Another CCR counsel present at the hearing, William Sheehan, stated more specifically that he appeared on behalf of the defendants other than GAF,[30] also without noting a special appearance.[31]

{¶ 68} At this hearing, Sheehan advanced the argument to the court that nondefaulting CCR members are not liable to the plaintiffs for any deficiency

---

26. See *State ex rel. Ragozine v. Shaker*, 96 Ohio St.3d 201, 2002-Ohio-3992, 772 N.E.2d 1192, ¶20, quoting *Maryhew v. Yova* (1984), 11 Ohio St.3d 154, 156–157, 11 OBR 471, 464 N.E.2d 538.

27. (Citations omitted.) *Goetz v. First Benefits Agency, Inc.* (Oct. 15, 1997), Summit App. No. 18381, 1997 WL 669727; see, also, *In re Crow* (Jan. 22, 2001), Darke App. Nos. 1521 and 1522, 2001 WL 62895.

28. See *McBride v. Coble Express, Inc.* (1993), 92 Ohio App.3d 505, 509, 636 N.E.2d 356.

29. As authorized by the Producer Agreement, the CCR is an agent acting on behalf of all of its members, which "shall have exclusive authority and discretion to * * * settle * * * or defend all asbestos-related claims." Section IV, paragraph 1 of the Producer Agreement.

30. Sheehan identified his clients in a discussion about a brief filed by CCR members other than GAF, stating: "As a matter of clarification, may I say that this is a brief filed by the other defendants in this case, other than GAF. It is not filed by the CCR. It is filed by the other defendants. *And it is on behalf of those other defendants that I appear.*" He made the same representation at the same proceeding later, stating at one point, "There is nothing in this agreement that gives the plaintiffs the option of pursuing the CCR members who have not defaulted. And those, Your Honor, are my clients."

31. The record reflects that the first time the nonparty CCR members raised the jurisdictional issue before the trial court was at the June 13, 2000 hearing, *after* the court had entered judgment against them.

because of a provision in Paragraph 13 of the settlement agreement, the same argument that the CCR members repeated at every subsequent hearing.

{¶ 69} The CCR members did not challenge the court's jurisdiction until after the court rendered a judgment against them on May 16, 2000, in response to the plaintiff's first motion. On appeal from that judgment, a group of CCR members, which referred to themselves as nonparty members, raised the jurisdictional defense for the first time.

{¶ 70} The record thus indicates that the CCR members failed to challenge the court's jurisdiction at their first appearance in this case; instead, they advanced arguments addressing the merits of the case in an effort to have the court adjudicate their dispute with K&F in their favor. Given this state of record, we conclude that the CCR members' participation was sufficient to constitute a voluntary appearance and accordingly a waiver of any jurisdictional claim. Having used the service of the court with a view to a resolution of the dispute, the CCR members cannot now be heard to complain of the court's lack of jurisdiction.

## 4. THE ACCORD AND SATISFACTION CLAIM

{¶ 71} Finally, the CCR members argue that the court erred in entering judgment against them in response to K&F's fourth and fifth motions to enforce the settlement agreement. They maintain that when they sent the payments due in December 2000 and June 2001, the letters accompanying the payments stated that the checks "constitute[d] full and final payment of the amounts due under the settlement for each of the claims * * *." They therefore assert that the plaintiffs' claims raised in these two motions were barred by the doctrine of accord and satisfaction.

{¶ 72} In order for the CCR members to successfully raise the affirmative defense of accord and satisfaction, (1) there must be a good-faith dispute over the debt, and (2) the creditor must have a reasonable notice that the check is intended as full satisfaction of the debt.[32]

{¶ 73} Here the parties' contentions surround whether a good-faith dispute existed over the debt owed by the CCR members to the plaintiffs. Our review of the trial record and the appellate briefs indicates that the parties did not dispute the fact that under the settlement agreement the installment payment of $10 million each was owed by the CCR members on December 2000 and on June 2001. Rather, the disputes in this case were whether the CCR assigned GAF a fair allocation and whether the CCR members are jointly and severally liable for what they collectively owed the plaintiffs under the settlement agreement. Disputes of such nature are not "over the debt" for accord and satisfaction to

---

32. See *Dawson v. Anderson* (1997), 121 Ohio App.3d 9, 698 N.E.2d 1014.

come into play and to preclude the plaintiffs' claims under the settlement agreement.

{¶ 74} For the foregoing reasons, we affirm the judgments of the court.

Judgments affirmed.

FRANK D. CELEBREZZE JR., J., concurs.

COLLEEN CONWAY COONEY, J., dissents.

COLLEEN CONWAY COONEY, Judge, dissenting.

{¶ 75} I respectfully dissent because I disagree with the majority's conclusion that under "the guidance of fundamental fairness," all CCR members should be held jointly and severally liable for the deficiency of one CCR member's share. There is no language in the settlement agreement providing joint and several liability of all CCR members. To the contrary, the settlement agreement expressly states that each CCR member "shall be liable under this (contract) only for its individual share," and the agreement also bars plaintiffs from seeking to hold the CCR members liable for other companies' unpaid contractual obligations. Paragraph 13 states:

{¶ 76} "In the event that the CCR fails to make any of the payments pursuant to paragraph 15 because any one of the CCR member companies fails to make timely payment of its individual share of such payment when such payment has become due in accordance with all of the terms of this Settlement Agreement, including Appendix C (a "Default"), Plaintiff Counsel shall have the option of either (a) declaring this Settlement Agreement null and void as against the Defaulting CCR member company only, with respect to any and all Plaintiffs whose claims have not at that time been paid by the CCR under paragraph 5 and Appendix C; or (b) declaring this Settlement Agreement null and void as against all CCR member companies with respect to any and all Plaintiffs whose claims have not at that time been paid by the CCR under paragraph 5 and Appendix C. Plaintiff Counsel shall exercise either of these options by providing written notice to the CCR of their decision to do so within 90 days of notice to that Counsel of any CCR member company's failure to make timely payment of its share of any payment due under paragraph 5. In the event that Plaintiff Counsel chooses to exercise (a) above, Plaintiff Counsel, the CCR, and the non-Defaulting CCR member companies shall remain bound by this Settlement Agreement, but any and all Plaintiffs whose claims have not been paid by the CCR under paragraph 5 and Appendix C as of the date of the Default shall be free either to bring suit to enforce the Defaulting CCR member company's obligations under this Settlement Agreement or to pursue their claims for asbestos-related bodily injury against the Defaulting CCR member company in the tort system. In the event that

Plaintiff Counsel chooses to exercise option (b) above, any and all Plaintiffs whose claims have not been paid by the CCR under paragraph 5d and Appendix C as of the date of the Default shall be free to pursue their claims against any CCR member companies in the tort system. Plaintiffs that opt to bring suit in the tort system under either option (a) or option (b) above shall have one year from the date of the written notice of termination to file their claims in the tort system, unless the applicable law provides for a longer period of time."

{¶ 77} This language clearly provides only several liability among the CCR members. I find it fundamentally unfair to hold all CCR members jointly liable for the deficiency of a defaulting member's share when the overwhelming majority of the CCR members were willing to pay their individual shares in full compliance with the terms of the settlement agreement. Therefore, I would reverse the trial court and enforce the terms of the settlement agreement that allow the plaintiffs to select one of the remedies provided in paragraph 13. I would not impose joint and several liability on the CCR members when no such remedy is provided in the settlement agreement.

## *APPENDIX*

### *ASSIGNMENTS OF ERROR*

{¶ 78} In appeal Nos. 78157, 78158, 78159, 78299, 78301 and 78314, which were consolidated for briefing and review, the "defendant members" of the CCR present the following assignments of error:

{¶ 79} "I. The Court of Common Pleas incorrectly held the other CCR defendants liable for GAF's unpaid share of the settlement—contrary to the clear terms of the settlement, contrary to the Producer Agreement, and contrary to fundamental fairness.

{¶ 80} "II. The Court of Common Pleas should have held that, as a disclosed principal, GAF is alone directly liable to plaintiff under the Settlement Agreement."

{¶ 81} In these appeals, "non-party members" of the CCR separately raise the following assignments of error:

{¶ 82} "I. The judgment below should be reversed as to the Non–Party CCR Members because the court lacked jurisdiction to enter judgment against them.

{¶ 83} "II. Even if the court of common pleas had jurisdiction over the Non–Party CCR Members, it erred by entering judgment against them rather than against GAF alone."

{¶ 84} In appeal Nos. 80083, 80332, and 80673, which were also consolidated for briefing and review, the appellants, referring to themselves as "Eleven Appellant Companies," present the following assignments of error:

{¶ 85} "I. The Court of Common Pleas erred in entering judgments holding the appellants jointly and severally liability [sic] upon the Settlement Agreement, which expressly states that each appellant 'shall be liable under this [contract] only for its individual share' and also bars the appellees from seeking to hold the appellants liable for other companies' unpaid contractual obligations. (February 22, 2001 Order; September 7, 2001 Order; December 14, 2001 Order.)

{¶ 86} "II. The Court of Common Pleas lacked jurisdiction to enter judgment on behalf of 1,842 appellees who filed suits in courts other than the court below, or to enter judgment on a settlement agreement made outside its presence, or to enter judgment against those appellants who were not defendants in the cases filed in the court. Id.

{¶ 87} "III. The Court of Common Pleas erred in refusing to hold that the appellees' cashing of the checks sent to them in payment of the amounts due under the contract amounted to an accord and satisfaction of their claims in case numbers 80083 and 80332. . (February 22, 2001 Order; September 7, 2001 Order.)"

{¶ 88} In these appeals, the appellants submitted another brief, titled "Brief of Nine Appellant Companies," which raises the following assignments of error:

{¶ 89} "I. The Court of Common Pleas erred in construing the contract at issue to impose joint and several liability on all appellants where the contract expressly states that each appellant 'shall be liable under this [contract] only for its individual share' and also bars the appellees from seeking to hold the appellants liable for other companies' unpaid contractual obligations. (September 7, 2001 order.)

{¶ 90} "II. The Court of Common Pleas erred in refusing to hold that the appellees' cashing of the checks sent to them in payment of the amounts due under the contract amounted to an accord and satisfaction of their claims. (Id.)

{¶ 91} "III. The Court of Common Pleas lacked jurisdiction to enter judgment on behalf of 757 of the appellees who filed suits in courts other the court below, and it lacked jurisdiction to enter judgment against appellants who were not defendants in the cases properly before the court. (Id.)

{¶ 92} "IV. The Court of Common Pleas erred in refusing to enforce the arbitration provision of the contract, which required appellees to arbitrate rather than litigate this dispute."

{¶ 93} In appeal No. 81576, the "Eleven Appellant Companies" present the following assignments of error:

{¶ 94} "I. The Court of Common Pleas erred in entering judgment holding the Appellants jointly and severally liable under the Settlement Agreement, which

expressly states that each Appellant 'shall be liable under this [contract] only for its individual share' and which also bars the Appellees from seeking to hold the Appellants liable for other companies' unpaid contractual obligations. (June 25, 2002 Order.)

{¶ 95} "II. The Court of Common Pleas lacked jurisdiction to enter judgment on behalf of 401 Appellees with no case pending before it; or to enter judgment on a settlement agreement made outside its presence; or to enter judgment for Appellees against Appellants that they had not sued; or to enter any judgment against I.U. North America, Inc. and C.E. Thurston & Sons, Inc., which were not defendants in *any* case before the court. Id."