## ULMAN v. MANHEIMER.

(Circuit Court of Appeals, Sixth Circuit. April 2, 1918.)

No. 3081.

1. CONTRACTS ⬥182(1)—CONSTRUCTION—JOINT OR SEVERAL LIABILITY.

An agreement between liquor salesmen and a corporation entered into when the salesmen became stockholders whereby each agreed to assume one-half of the loss which might be sustained on accounts transferred to the corporation for merchandise shipped to the respective customers of each, must be deemed several instead of joint and not to render each salesman liable for losses on account of sales made by his associate, for otherwise no effect would be given to the word "respective," this being true regardless of the previous practice between the parties whereby the two salesmen and another who had formed an association each guaranteed to make good any loss of profits credited to the association on account of sales made by any of its members.

2. CORPORATIONS ⬥123(16)—PLEDGE OF STOCK—GENERAL VERDICT—SPECIAL FINDINGS.

. In a suit to recover a surplus after a sale of corporate stock alleged to have been held as security, where there was a general verdict for plaintiff, but certain dividends claimed were denied, the denial of the dividends cannot be deemed a special finding inconsistent with the general verdict where it was doubtful whether defendant ever received such dividends and it appeared, though not from the bill of exceptions, that plaintiff's counsel after argument, attempted to withdraw the claim to dividends.

3. TRIAL ⬥258(1)—INSTRUCTIONS—REQUEST.

Where in an action on a contract defendant relied on the practical construction by the parties as well as a new and independent agreement, the refusal of an instruction submitting both theories of defense, but which the court treated as dealing solely with the practical construction, on which issue he had already charged the jury, cannot be deemed error where its double aspect was not appropriately called to the court's attention.

In Error to the District Court of the United States for the Western Division of the Southern District of Ohio; John E. Sater, Judge.

Action by Leo Manheimer against Adolph Ulman. Judgment for plaintiff, and defendant brings error. Affirmed.

In the court below, Manheimer, as plaintiff, filed a petition showing the necessary diverse citizenship to give jurisdiction, and further alleging that on April 10, 1911, he was directly indebted to Ulman, defendant in the action, in the sum of about $2,500, and was also indebted upon a guaranty in the sum of about $1,300; that defendant held, as collateral security for such debts, plaintiff's stock in the Ulman Company, a corporation; that in foreclosure of the collateral security, the defendant sold the stock and realized from it and from dividends about $8,700; that thereupon there became due to plaintiff the difference, about $4,900, for the recovery of which the action was brought. Upon the trial before a jury, plaintiff withdrew his claim as to dividends and recovered a judgment for the remainder of his demand, being, with interest to the date of the judgment, about $5,500. Upon a writ of error, the defendant below brings up a record containing the substance of all the testimony and disclosing a history of the transaction, an outline of which is sufficient for present statement. Some of the questions of fact must have more detailed statement hereafter.

Ulman & Co., prior to January 1, 1907, was a partnership engaged in selling liquors at wholesale. On that date the partnership became a corpora-

tion, under the same name and continuing the same business. In July, 1904, Manheimer was a traveling salesman, selling to the retail trade in liquors, and having regular customers, so that he had a certain degree of established business. Goodman was another salesman in a similar situation; so was Ehrlich. These three (and another for part of the time involved), in July, 1904, formed an association analogous to a partnership. They will be here designated as the associates, or as Goodman & Co. At about the time last named, the associates made an oral contract with Ulman & Co., the partnership, by which the associates were to have the exclusive right to sell the Ulman goods in certain territory. Ulman & Co.'s net profit on such goods was to be computed by deducting from the selling price the cost, the expenses of sale, losses, etc., and these net profits were to be divided, one-half to Ulman & Co., in compensation for their part in carrying on the enterprise, and one-half to the associates in compensation for their personal services; but the profits to which Goodman & Co. were entitled were contingent upon the actual receipt by Ulman & Co. of payment for goods sold. The method of bookkeeping by Ulman & Co., followed up until January, 1907, without objection, and which we assume was known, in substance if not in form, to the associates, was this: A memorandum ledger account was kept with Goodman & Co. To this was credited one-half the gross profits made upon each sale by any associate. Against it were charged one-half the expense of the sales, one-half the discounts, and one-half of any loss upon any sale made by any associate whenever the transaction had reached the stage where it was to be entered upon the books as a loss. There were also charged against it all sums paid to the associates on account of their indicated profit. There can be no doubt that if, through a loss upon an account which had been considered good, it had developed that the associates had been overpaid and had received money which turned out not to be profits, there would have been a liability to repay this excess, or, what is the same thing, to deduct it from the next profits which would otherwise have become payable; but there was not, by the associates, any guaranty whatever that the accounts made by them would prove collectible or would be paid. There was a written contract between the associates regarding the disposition of these profits, which provided in substance that the profits should constitute a fund out of which each of the associates should be paid a specified salary, and that the balance of the net profits should be divided in equal shares among the associates. For the purposes of this case, we may accept the defendant's theory that the liability of the associates to return to Ulman & Co. any overpayment—the only liability there was—was joint and not several. From accounts kept in this fashion, it appeared, on January 1, 1907, that plaintiff's share of the accumulated undistributed profits, on the theory that all accounts were good, was $3,153, and in making closing bookkeeping entries at the end of 1906, Ulman & Co. carried this amount to plaintiff's credit on his personal account on their books. He also there had prior credits more or less directly the result of previous distributions or payments of his share of the profits, so that his total credits on this account were about $7,500. Goodman, one of the other associates, was similarly situated, but with different amounts of credit.

All parties desiring that Goodman and plaintiff should be stockholders in the corporation, the Ulman Company, into which the partnership, Ulman & Co., was being transformed, it was agreed that plaintiff should purchase at par $10,000 of the stock from Ulman, who seems to have been acting in some measure for the corporation. Plaintiff paid for this by transferring to Ulman the $7,500 credit on the partnership books and by giving Ulman his notes for $2,500. Goodman made a similar arrangement. The notes contained a pledge of the stock as security for the payment of the notes. The transaction was completed by the execution of the contract of guaranty given in the margin signed by Goodman and by plaintiff.[1] The parties thereto, Ulman and

---

[1] "Whereas, each of the undersigned * * * for a valuable consideration duly received is answerable to and now agrees to make good to the Ullman

Strauss, composed the former partnership. All the assets of the partnership were transferred to the corporation and all the outstanding accounts made by the associates were taken over by the corporation as assets at their sum as carried on the partnership books. Plaintiff made some payments to Ulman upon his notes. Some small losses developed upon accounts which had been thus transferred, and on the corporation books one-third of the loss was charged to plaintiff's private account (plaintiff says, without his knowledge). In 1909, it was ascertained that a very large loss, involving, not only profits, but the whole selling price, had occurred upon the account of the South Carolina Dispensary. This sale had been made by Goodman, who had the Southern territory, while plaintiff's territory had been in Colorado and the West. The corporation charged one-third of this loss to plaintiff's private account, and, when plaintiff disputed liability, defendant sold his stock under the pledge, realizing $8,100. The matter in dispute was whether, under the contract of January 10, 1907, plaintiff was liable for losses upon accounts for goods sold by any of the associates before January 1, 1907, or was liable only for losses upon the accounts which he had made in his Western territory. Upon the latter theory, plaintiff was entitled to the verdict which he recovered (unless for one subordinate question); upon the former theory, his liability was greater than the entire proceeds of the stock sold.

Simeon M. Johnson, of Cincinnati, Ohio, for plaintiff in error.

Dolle, Taylor, O'Donnell & Geisler and Jas. B. O'Donnell, all of Cincinnati, Ohio, for defendant in error.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). [1] When we read the contract of January 10, 1907, in connection with the admitted circumstances, we think it must be construed according to plaintiff's theory. There are considerations tending in the opposite direction, but, upon the whole, they are overbalanced. Chief among these is the fact that through this construction Manheimer finally realizes the $3,153, and perhaps further sums, contingently credited to him, but which, as events happened, he would not have been entitled to if the old arrangement had continued unchanged. Assuming, as is entirely clear, that, under the old arrangement, this credit to plaintiff of $3,153 would have been rightfully canceled when the South Carolina loss occurred, its cancellation would still seem to be rightful if the extent and character of the plaintiff's liability had remained un-

Company, an Ohio corporation, one-half of any loss, which may be sustained by said company on any of the accounts transferred to it for merchandise shipped by Ulman Company to our respective customers. * * *

"Whereas, each of the undersigned * * * has deposited with the said Adolph Ulman as trustee for the Ulman Company the respective shares of stock owned by each in the Ulman Company, as security for the performance by each of his agreement aforesaid with the right in said trustee to sell said stock on such terms at such time, in such manner and on such notice to us as to him may seem best, to make good any of said loss for which we are respectively liable whenever the same may be sustained.

"Now, therefore, in consideration of the premises and one ($1) dollar paid to each of us by the said Adolph Ulman, trustee as aforesaid, we each severally agree to and with the said Adolph Ulman, trustee as aforesaid, that he shall retain said stock in his possession as said trustee until it is finally ascertained to his satisfaction that no loss will be sustained by the Ulman Company on the accounts aforesaid. * * *"

changed. In other words, under the old arrangement, Manheimer would have been subject to lose this sum through the failure of one of Goodman's sales; plaintiff's then liability was, to that extent, joint and not separate; and it would be natural to think that plaintiff's liability under the new contract would be of the same joint character. However, we find that the extent of his liability was very materially changed. It was increased perhaps many fold. It had extended only to the associates' one-half of the profits made by the Ulman partnership upon a sale; but these accounts were being taken over by the corporation at their face value in payment of its capital stock. The old association relations were ending; they were assuming new relations to each other and to the corporation; and it was not out of place for the corporation to require, as it did, a guaranty of payment or against any loss on these accounts. Plaintiff might have been very willing to continue his agreement to give back profits that had come from a sale by any of the associates; it was a very different thing to ask him to guarantee the accounts. He would be familiar with the facts attending his own sales and with the pecuniary condition of his own customers in the Western territory. He would know nothing about those in the Southern territory, except what Goodman might have told him. It would be natural and probable that he should be willing to give a positive guaranty as to his own customers in exchange for the surrender of his liability to repay profits which he had received from Goodman's sales. It would be unnatural and improbable that for the same consideration he should be willing to guarantee Goodman's sales. The language of the contract is consistent with this interpretation. It had been well understood that each of the associates had his own customers in his own territory; the agreement is signed by two of the associates, plaintiff and Goodman; and it says that:

"Each of the undersigned * * * agrees to make good to the Ulman Company * * * one-half of any loss which may be sustained by said company on any of the accounts transferred to it for merchandise shipped by Ulman Company to our respective customers."

And again:

"Each of the undersigned * * * has deposited * * * the respective shares of stock owned by each * * * as security for the performance by each of his agreement * * * to make good any of said losses for which we are respectively liable."

Not only does the use of the word "respective" and "respectively" import the idea that each associate was contracting only with reference to the losses connected with his own customers; but, unless this is the meaning of the contract, there is no satisfactory force in the words "each of the undersigned."

It is argued that this language was adopted so as to make the contract liability several as well as joint; but this conclusion presupposes that otherwise existing merely joint liability which the word "respective" negatives. When several individuals are to share in a liability of which each has created a part, and it is desired that all should be liable, and that each should be liable for the whole, it is the customary

language of the law to declare that they are jointly and severally liable. When a skilled draftsman, acting for the party to which the obligation was owing, departed from this familiar formula and said, "Each of us agrees to be liable for our respective shares," we think the conclusion inevitable that the liabilities were fractional, and not unitary. Otherwise, the word "respective" becomes not merely surplusage, but contradictory. For definitions and constructions of "respective" or "respectively," see Alsop v. Russell, 38 Conn. 99, 103; Wolf v. Lake Erie Co., 55 Ohio St. 517, 45 N. E. 708, 36 L. R. A. 812; Messer v. Jones, 88 Me. 349, 34 Atl. 177; Patrick v. Royle, 13 Q. B. 98, 112.

We may concede that if these words were to be considered by themselves, without knowing the situation to which they were applied, there might be enough of ambiguity, so that the construction we have adopted would be compelled to yield to the effect of a practical construction by the parties; but the trial court took the view that there was such an ambiguity, and submitted to the jury the effect of the practical construction which defendant alleged and plaintiff denied, and the verdict of the jury has the effect of a finding that the plaintiff was right in his denial. The subject of interpretation through practical construction is therefore eliminated from the case; and when we hold, as we do, that as matter of law the liability was distributive, and not in gross, all the error alleged on the subject of evidence to explain or interpret becomes immaterial.

We find no prejudicial variance between the contract of guaranty of payment made with the corporation, as alleged in the petition, and the contract of guaranty against loss made with Ulman, as shown by the proofs. Ulman was, in this respect, a trustee for the corporation. There was only this one written contract between the parties, and the defendant was never misled or prejudiced in the least.

[2] It is plain enough from the figures that the jury allowed all of plaintiff's claims described in the petition, except for the dividend which it was said belonged to plaintiff and had been received by defendant, and that this claim for dividend was rejected. Defendant now argues that the action of the jury in accepting defendant's position about the dividend was, in effect, a special finding, inconsistent with the general verdict. This claim would require examination, were it not for the fact, alleged by counsel and not disputed, that in the final argument to the jury, and after the judge had charged upon the subject of this dividend, plaintiff's counsel became doubtful of the sufficiency of the proof to show that the defendant had ever in fact received it, and so withdrew the item from the jury. This occurrence is not a part of the record of the trial, as fixed by the bill of exceptions; but it is enough to say that the rejection of the item by the jury may have been because of this or for some similar reason, and so is not necessarily inconsistent with the general verdict rendered.

[3] By an amendment to the answer, defendant claimed that, even if the written contract of January 10, 1907, was only that plaintiff would make good losses on the accounts of his own customers, yet that the next year, when the dividend on his stock became payable from the corporation to plaintiff, and when, by the terms of the

pledge, defendant had the right to take this dividend and apply it on the notes due him, plaintiff, in consideration of defendant abandoning that right, orally agreed to assume liability for all the customers' accounts, Goodman's as well as his own, and to allow the dividend to be applied by the corporation upon that joint liability. During the trial, there was some evidence tending to support this answer; but that distinct issue received little attention. At the end of the trial, defendant submitted a series of special requests, No. 2 of which was:

"If the jury should find that the parties to the writing of January 10, 1907, sued on in the within action, have themselves construed the writing as not the contract between them, but subsequently entered into an agreement, whether verbally or by conduct, different from that set forth in the contract, then I charge you will adopt and give effect to the later agreement."

This was refused. If it had distinctly presented the issue raised by the amended anwer, there would be force in the contention that the refusal was error, though it is not clear how this new oral agreement would have escaped the statute of frauds. However, it is not certain that the request was aimed at this defense. The same acts and words relied on to show the new contract were relied on also to show the practical construction of the old; both the testimony and the second request had this double aspect; the court seemed to regard this request as directed to the subject of practical construction and charged fully upon that subject; and neither by exception nor by a further request was the trial court advised that this request was intended to present specifically the defense of a new and independent contract. We conclude that fairness to the trial court requires that a point of this kind should be clearly and distinctly brought to his attention, and that error cannot be predicated solely upon the refusal of a request which covers up as much as it discloses of the contention afterwards made.

The judgment is affirmed.