IN RE ALL KELLEY & FERRARO ASBESTOS CASES.

[Cite as *In re All Kelley & Ferraro Asbestos Cases*,104 Ohio St.3d 605, 2004-Ohio-7104.]

*Mass tort litigation – Asbestos – Settlement agreement with multiple asbestos producers – Agreement provides for several liability, not joint and several liability, when.*

(No. 2003-1653 — Submitted September 14, 2004 — Decided December 30, 2004.)

APPEAL from the Court of Appeals for Cuyahoga County, Nos. 78158, 78159, 78299, 78301, 80083, 80332, 80673, and 81576, 153 Ohio App.3d 458, 2003-Ohio-3936, 794 N.E.2d 729.

_____

**O'DONNELL, J.**

**{¶ 1}** Two issues are presented for consideration in connection with this appeal, which concerns the resolution of some 15,000 asbestos-related claims settled for approximately $120 million between the law firm of Kelley & Ferraro, L.L.P., and the Center for Claims Resolution ("CCR") as agent for 19 member companies: first, regarding the nature of the liability incurred by the members of the CCR, and second, regarding whether the trial court had jurisdiction to enter judgment for each claimant against all CCR members.

**{¶ 2}** The record before us reveals that in 1988, a consortium of former asbestos-producing or distributing companies entered into an agreement styled the "Producer Agreement Concerning Center for Claims Resolution" ("Producer Agreement"), which created the CCR, a nonprofit Delaware organization, to administer and resolve asbestos-related claims. The agreement—as amended on February 1, 1994—governs the relationships between and among the CCR

members and designates the CCR as each member's sole agent to "administer and arrange [on its behalf] for the evaluation, settlement, payment or defense of all asbestos-related claims."

{¶ 3} The agreement contains a formula for calculating each member's percentage share of liability payments[1] and allocated expenses[2] "attributable to each claim handled by the [CCR] as sole agent for such Participating Producer."[3] And it requires any dispute among the members concerning the agreement, including disputes involving the allocation of percentage shares of liability payments, to be resolved through alternative dispute resolution.

{¶ 4} On July 26, 1999, pursuant to the authority conferred by the Producer Agreement, the CCR negotiated a settlement agreement on behalf of 19 member companies[4] with the law firm of Kelley & Ferraro to resolve the asbestos-related claims of approximately 15,000 claimants. At that time, these claimants had individual cases pending in Ohio, Florida, Mississippi, and Massachusetts, among other jurisdictions.

{¶ 5} That settlement agreement estimated the dollar value of the settlement at a total of $120 million to be paid in equal biannual installments of $10 million each commencing September 1999 and ending December 2004. The

---

1. "Liability Payment" is defined in the Producer Agreement as "the sums paid in settlement of, or in satisfaction of a judgment on, any asbestos-related claims, exclusive of allocated and unallocated expenses for such claims."

2. "Allocated Expenses" are "all fees and expenses incurred for services performed outside the [CCR] that can be directly attributed to the defense and disposition of a particular asbestos-related claim."

3. A participating producer is defined as "persons that are or were engaged in the mining, manufacturing, production, processing, fabrication, distribution, installation, sale or use of asbestos or asbestos-containing products or that may have a liability with respect to asbestos-related claims that have become signatories to the [Producer] Agreement."

4 Those member companies are Amchem Products, Inc., Armstrong World Industries, Inc., Asbestos Claims Management Corp., CertainTeed Corp., C.E. Thurston & Sons, Inc., Dana Corp., Ferodo America, Inc. (formerly Nuturn Corp.), Flexitallic, Inc., GAF Corp. (now G-I Holdings, Inc.), I.U. North America, Inc., Maremont Corp., National Service Industries, Inc., Nosroc Corp., Pfizer Inc., Quigley Co., Inc., Shook & Fletcher Insulation Co., Turner & Newall, PLC, Union Carbide Corp., and United States Gypsum Co..

parties arrived at the total settlement amount based upon Kelley & Ferraro's approximation of the number of claimants who would qualify for payment in each disease category. And, further, a condition of payment required each claimant to provide documentation of an asbestos-related illness, exposure to "asbestos-containing materials that were manufactured, sold, marketed or distributed by one or more members of the CCR," and "compliance * * * with the applicable statute of limitations or other applicable timeliness doctrines" and a release of all CCR member companies from liability. Upon claimants' failure to tender the requisite documentation or refusal to accept the settlement amount for an individual claim, CCR members would adjust their installment payments.

{¶ 6} Against this contract posture, the CCR in connection with the amounts due in 1999 submitted a payment to Kelley & Ferraro deficient by $987,295.27, stating that the shortfall arose because GAF had refused to pay its allocated share. GAF had disputed the CCR's calculation of its share in accordance with the Producer Agreement. In response, Kelley & Ferraro filed a motion to enforce the settlement agreement. After a hearing, the trial court granted that motion and entered a $987,295.27 judgment against all CCR members, including GAF. The court concluded that, because the CCR had promised to deliver a lump sum on specified dates in exchange for settlement of individual claims, and because the settlement agreement did not apportion the sums among the members, GAF's disagreement over its allocated share constituted an internal dispute to be decided by alternative dispute resolution, pursuant to the terms of the Producer Agreement. Members of the CCR timely appealed that decision to the appellate court.

{¶ 7} When the next payment became due, the CCR tendered an installment deficient by $2,210,154.62, explaining that GAF had again failed to pay its share as calculated by the CCR. Consequently, Kelley & Ferraro filed another motion to enforce the settlement agreement, which the trial court granted,

entering judgment for all claimants against all CCR members in the amount of the shortfall. Members of the CCR again appealed.

{¶ 8} Regarding the next four installments, an increasing number of members failed to pay their shares as determined by the CCR, resulting in larger shortfalls. For the December 2000 installment, GAF and Asbestos Claims Management Corporation ("ACMC") did not pay their allocated shares. And in May 2001, the CCR sent Kelley & Ferraro another deficient payment, as GAF, ACMC, and Armstrong World Industries ("Armstrong") failed to pay their shares. At that point, both Armstrong and GAF had filed for bankruptcy protection, and, at a hearing, the members described ACMC as insolvent.

{¶ 9} By December 2001, in addition to GAF and Armstrong, four more CCR members had filed bankruptcy petitions or their foreign equivalent: United States Gypsum Corporation, Turner & Newall, PLC, Ferodo America, Inc., and Flexitallic, Inc. Consequently, none paid the shares allocated to them by the CCR. For that installment, ACMC and Shook & Fletcher Insulation Company, which subsequently filed for bankruptcy in April 2002, also failed to pay. This time, however, although it had collected shares from the nondefaulting companies, the CCR, instead of forwarding a deficient payment to the law firm, sent Kelley & Ferraro a letter requesting that it pursue one of the options contained in paragraph 13 of the settlement agreement.[5] The CCR sent Kelley & Ferraro a similar letter regarding the June 2002 installment and again withheld the amounts it had collected from nondefaulting members.

---

5. Paragraph 13 of the settlement agreement provides that "[i]n the event that the CCR fails to make any of the payments pursuant to paragraph 5 because any one of the CCR member companies fails to make timely payment of its individual share of such payment when such payment has become due * * *," the claimant may either void the settlement agreement as to the defaulting member companies or void the settlement agreement in its entirety. Regarding the first option, however, the claimants may pursue the defaulting member company in tort or sue to enforce its contractual obligation.

{¶ 10} As a result of the foregoing events, Kelley & Ferraro filed four additional motions to enforce the settlement agreement. The trial court, consistent with its earlier decisions, granted these motions and awarded the claimants the deficient amounts plus interest. Again, members of the CCR separately appealed each judgment to the appellate court. Not all of the trial court's orders, however, entered judgment against all CCR members, primarily due to pending bankruptcy proceedings; nonetheless, in every instance, the trial court entered judgment against all 11 members appealing to this court.

{¶ 11} The appellate court eventually consolidated eight separate appeals arising from the trial court's decisions to grant Kelley & Ferraro's six separate motions to enforce the settlement agreement. In its opinion, the court affirmed the trial court's judgments and held that the agreement provided for joint and several liability among the CCR members. *In re All Kelley & Ferraro Asbestos Cases*, 153 Ohio App.3d 458, 2003-Ohio-3936, 794 N.E.2d 729, ¶ 57. It explained that, although the phrase "each CCR member shall be liable under this Settlement Agreement only for its individual share"[6] appeared to indicate several

---

6. {¶a} This phrase appears in paragraph 13 of the settlement agreement, which states in its entirety:

{¶b} "Payments to Plaintiff Counsel by the CCR under paragraph 5 of this Settlement Agreement shall be funded by the CCR member companies in accordance with the terms of the Producer Agreement Concerning Center For Claims Resolution (as amended, effective February 1, 1994) and each CCR member company shall be liable under this Settlement Agreement only for its individual share of such payments as determined under that Producer Agreement. In the event that the CCR fails to make any of the payments pursuant to paragraph 5 because any one of the CCR member companies fails to make timely payment of its individual share of such payment when such payment has become due in accordance with all of the terms of this Settlement Agreement, including Appendix C (a 'Default'), Plaintiff Counsel shall have the option of either (a) declaring this Settlement Agreement null and void as against the Defaulting CCR member company only, with respect to any and all Plaintiffs whose claims have not at that time been paid by the CCR under paragraph 5 and Appendix C; or (b) declaring this Settlement Agreement null and void as against all CCR member companies with respect to any and all Plaintiffs whose claims have not at that time been paid by the CCR under paragraph 5 and Appendix C. Plaintiff Counsel shall exercise either of these options by providing written notice to the CCR of their decision to do so within 90 days of notice to that Counsel of any CCR member company's failure to make timely payment of its share of any payment due under paragraph 5. In the event that Plaintiff Counsel choose to exercise option (a) above, Plaintiff Counsel, the CCR, and the non-Defaulting CCR

liability, the words read in context and in conjunction with other settlement provisions imposed joint and several liability among the members. Id. at ¶ 42-43, 56.

{¶ 12} The court interpreted the first sentence in paragraph 13 of the settlement agreement as "defining the members' liability *vis-à-vis each other*" (emphasis sic), not their liability to claimants and, therefore, as imposing joint and several liability on the CCR members. Id. at ¶ 56. The court additionally stated that its interpretation comported with fundamental fairness, as the parties did not dispute the total amount owed to the claimants and as the CCR members were better situated to pursue a defaulting member for its share. Id. at ¶ 58-60.

{¶ 13} Additionally, the court overruled the arguments of the CCR members that the trial court lacked jurisdiction to adjudicate the asbestos claims filed in other jurisdictions and that the trial court lacked personal jurisdiction to enter judgment against members of the CCR who had not been named as defendants or served with process in the underlying lawsuits. Id. at ¶ 63. The appellate court concluded that the members had waived any jurisdictional defects by voluntarily appearing and defending against the claimants' motions and by failing to raise such arguments until after the trial court entered judgment against them in the first motion to enforce. Id. at ¶ 70.

---

member companies shall remain bound by this Settlement Agreement, but any and all Plaintiffs whose claims have not been paid by the CCR under paragraph 5 and Appendix C as of the date of the Default shall be free either to bring suit to enforce the Defaulting CCR member company's obligations under this Settlement Agreement or to pursue their claims for asbestos-related bodily injury against the Defaulting CCR member company in the tort system. In the event that Plaintiff Counsel choose to exercise option (b) above, any and all Plaintiffs whose claims have not been paid by the CCR under paragraph 5 and Appendix C as of the date of the Default shall be free to pursue their claims against any CCR member companies in the tort system. Plaintiffs that opt to bring suit in the tort system under either option (a) or option (b) above shall have one year from the date of the written notice of termination to file their claims in the tort system, unless the applicable law provides for a longer period of time."

**{¶ 14}** The cause is now before this court in accordance with our acceptance of a discretionary appeal filed by 11 CCR members: Amchem Products, Inc., C.E. Thurston & Sons, Inc., CertainTeed Corp., Dana Corp., I.U. North America, Inc., Maremont Corp., National Service Industries, Inc., Nosroc Corp., Pfizer Inc., Quigley Co., Inc., and Union Carbide Corp. But we have stayed the proceedings in this case as to Quigley Co., Inc. and Pfizer, Inc., due to a bankruptcy action pending in the United States Bankruptcy Court for the Southern District of New York. See 103 Ohio St.3d 1445, 2004-Ohio-4799, 814 N.E.2d 1226.

Arbitration

**{¶ 15}** We begin by noting that the settlement agreement contains an arbitration clause.[7] And in *Cales v. Armstrong World Industries, Inc.*, Scioto App. No. 02CA2851, 2003-Ohio-1776, the Fourth District Court of Appeals considered a similar settlement agreement negotiated by the CCR and ordered arbitration of a comparable dispute after determining that the agreement was sufficiently ambiguous regarding whether the member companies agreed to be jointly and severally liable. See, also, *Besece v. Armstrong World Industries, Inc.*, Jefferson App. No. 03 JE 8, 2004-Ohio-3636; 2004 WL 1533253; *Rourke v. Amchem Prods., Inc.* (2003), 153 Md.App. 91, 835 A.2d 193. As pointed out by claimants in the instant matter, however, neither party has argued the applicability of the arbitration provision, and, therefore, we decline to address the matter. See, generally, *Bryant v. Clark* (1992), 62 Ohio St.3d 485, 584 N.E.2d 687, syllabus (stating that "[a]n insurer that consents to a default judgment in a suit against an uninsured motorist, and does not request arbitration until after that judgment has

---

7. That provision states: "It is agreed that the parties will make good faith efforts to resolve any disputes which may arise while carrying out the terms and conditions of this Agreement. If the parties are unable to resolve a dispute, the issue shall be referred to a mutually agreeable arbitrator for binding resolution."

been entered, has waived its right to submit the issues of liability and damages to arbitration").

Joint and Several Liability

**{¶ 16}** The principal issue presented for our review concerns whether the settlement agreement provides for several liability, as contended by the members of the CCR, or for joint and several liability, as maintained by the claimants and as determined by the appellate court.

**{¶ 17}** Claimants argue that the settlement agreement creates joint and several liability and have correctly presented the law in Ohio as it has existed for over 160 years—that joint and several liability generally attaches when multiple parties default on their collective promise to pay a single sum of money, unless the contract sets forth their individual obligations. See *Stage v. Olds* (1843), 12 Ohio 158, 167 1843 WL 21 (stating that "[w]hen several persons execute an instrument, in parol or under seal, upon the same consideration, at the same time, and for the same purpose, and taking effect from a single delivery, they are, in legal effect, joint contractors or obligors"); *Wallace v. Jewell* (1871), 21 Ohio St. 163, 171-172; 1871 WL 45; *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58.

**{¶ 18}** In the textbook case of *Raffles v. Wichelhaus* (Ex.1864), 159 Eng.Rep. 375, the parties there also entered into an agreement but were uncertain of its meaning. They had agreed to the sale of cotton aboard a ship named *Peerless* from Bombay, when, in fact, two ships arriving from Bombay bore that name. The seller claimed that he complied with the agreement when a ship named *Peerless* arrived. The buyers, on the other hand, who had refused to pay for that cotton, maintained that no meeting of the minds ever occurred, and, accordingly, no contract ever existed, due to a latent ambiguity—the seller meaning one *Peerless* and the buyer meaning the other. The court entered judgment for the buyers.

**{¶ 19}** This case, however, is different from *Raffles* in that the signatories of the settlement agreement do not disagree that a valid contract exists, but rather, differ as to whether the contract language creates joint and several liability or only several liability.

**{¶ 20}** The focus of their difference centers upon paragraph 13 of the settlement agreement, the first sentence of which provides:

**{¶ 21}** "Payments to Plaintiff Counsel by the CCR under paragraph 5 of this Settlement Agreement shall be funded by the CCR member companies in accordance with the terms of the Producer Agreement Concerning Center For Claims Resolution (as amended, effective February 1, 1994) and *each CCR member company shall be liable under this Settlement Agreement only for its individual share of such payments as determined under that Producer Agreement*." (Emphasis added.)

**{¶ 22}** The remainder of paragraph 13 contains options available to the claimants in the event that a member company fails to pay its allocated share: "In the event that the CCR fails to make any of the payments pursuant to paragraph 5 because any one of the CCR member companies fails to make timely payment of its individual share of such payment when such payment has become due * * *," the claimants may (1) void the settlement agreement as to the defaulting member companies or (2) void the settlement agreement as to all CCR members. Under the first option, claimants may either pursue the defaulting member company in the tort system or sue to enforce its obligation under the agreement.

**{¶ 23}** The member companies assert that the first sentence of paragraph 13 unambiguously provides, in their words, that "each company is liable under the Settlement Agreement *only* for its own share—*not* for the entire amount of the settlement and *not* for the shares of other companies." (Emphasis sic.) And by subsequently defining the options available to the claimants when they receive a deficient payment due to one company's failure to pay its allocated share,

paragraph 13 further demonstrates that the parties envisioned that "default by one company will result in a shortfall, not in increased payments by the other companies." Any other interpretation—according to the member companies—would render those options meaningless, as there would be no impetus for the claimants either to pursue only the defaulting company when they could pursue all of them for the deficiency, or to void the agreement in its entirety and sue the members in the tort system when they would always be paid in full under the contract.

{¶ 24} The claimants, on the other hand, assert that the language in paragraph 13—"each CCR member company shall be liable under this Settlement Agreement only for its individual share of such payments as determined under the Producer Agreement"—creates several liability *only when* the CCR has followed the terms of the Producer Agreement in allocating each member's individual share. And they subsequently point to three main instances where the member companies allegedly failed to adhere to those terms.[8] Their argument continues that without a clear articulation of individual shares and because the settlement agreement does not specify the individual amounts owed by each company, the claimants have no basis to assert a claim against any one company; and under those circumstances, the law permits the agreement to be enforced jointly and severally among the member companies.

---

8. According to the claimants, the member companies did not comply with the Producer Agreement when they (1) failed—as allegedly required by Section F of Attachment A—to "pick up the shares" of companies whose membership in the CCR had been terminated due to filing for bankruptcy protection, (2) allocated shares to companies that had filed for bankruptcy protection, as the CCR lost its agency authority under the Producer Agreement upon membership termination and as the U.S. Bankruptcy Code delegates to the bankruptcy courts the exclusive authority to determine a debtor's obligations, and (3) failed to conclusively determine GAF's share for the 1999 installments due to an internal dispute over share allocation.

**{¶ 25}** The claimants' assertion regarding the CCR's failure to properly make a final share allocation for each member prior to each installment is not well taken. The record shows that they knew of and agreed with the share allocation procedure as set forth in the Producer Agreement and that they were aware that the Producer Agreement expressly conferred no rights to third parties. Further, the individual share allocation of a member does not affect the nature of the promises made by the member companies in paragraph 13 of the settlement agreement, as will be further developed.

**{¶ 26}** As is evident, we must decide whether the member companies promised separate and limited performances to pay their respective shares or whether they promised the same performance to pay the entire estimated amount of $120 million. In the first of these alternatives, each member company would be responsible only for its individual promise and could not be held liable for the obligations of others, while in the second, each would be responsible for the whole performance. See 12 Williston on Contracts (4 Ed.1999) 611-612, Section 36:1; see, also, *Reliant Energy Servs., Inc. v. Enron Canada Corp.* (C.A.5, 2003), 349 F.3d 816, 823.

**{¶ 27}** Corbin on Contracts explains that "[t]he question whether two or more promisors have promised a single undivided performance, or have each promised a limited and separate performance, is wholly a problem of interpretation. The question is merely what was the performance promised and who promised it." 9 Corbin on Contracts (Interim Ed.2002) 625, Section 926; see, also, *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, where a plurality of this court considered the evidence and circumstances surrounding an oral settlement to ascertain the parties' intent regarding joint and several liability.[9] Therefore, although a promise by two or more promisors

---

9. *Kostelnik* held that a $1.2 million oral settlement resolving a wrongful-death action between Kostelnik and the defendants—Dr. Helper and Meridia Hillcrest Hospital—did not impose joint

generally suggests that the same performance, and not separate performances, will be rendered, the parties' intent controls. See 2 Restatement of the Law 2d, Contracts (1981) 407, Section 288(1).

{¶ 28} With this reference, we acknowledge that "a settlement agreement is a contract designed to terminate a claim by preventing or ending litigation" and that the construction of a written contract is a question of law, which we review de novo. *Continental W. Condominium Unit Owners Assn. v. Howard E. Ferguson, Inc.* (1996), 74 Ohio St.3d 501, 502, 660 N.E.2d 431; *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm* (1995), 73 Ohio St.3d 107, 108, 652 N.E.2d 684; *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph one of the syllabus.

{¶ 29} In construing the terms of a written contract, the primary objective is to give effect to the intent of the parties, which we presume rests in the language that they have chosen to employ. *Saunders v. Mortensen*, 101 Ohio St.3d 86, 2004-Ohio-24, 801 N.E.2d 452, at ¶ 9, citing *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 31 OBR 289, 509 N.E.2d 411, paragraph one of the syllabus. "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Alexander*, 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, at paragraph two of the syllabus. Where the terms are clear and unambiguous, a court need not go beyond the plain language of the agreement to determine the rights and obligations of the parties. *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St. 3d 51, 53, 544 N.E.2d 920, 923. Where possible, a court must

---

and several liability among the defendants but rather constituted the sum of two separate settlements reached with Kostelnik—one involving Helper for $1.1 million and the other involving Hillcrest for $100,000.

construe the agreement to give effect to every provision in the agreement. *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 362, 678 N.E.2d 519, quoting *Farmers Natl. Bank v. Delaware Ins. Co.* (1911), 83 Ohio St. 309, 94 N.E. 834, paragraph six of the syllabus.

{¶ 30} In the present case, the language—"Payments to Plaintiff Counsel by the CCR under paragraph 5 of this Settlement Agreement shall be funded by the CCR member companies in accordance with the terms of the Producer Agreement * * * and each CCR member company shall be liable under this Settlement Agreement only for its individual share of such payments as determined under that Producer Agreement"—can only be interpreted as imposing several liability upon the CCR member companies and manifests the parties' intent that each member be responsible for only its individual share of the total settlement amount as calculated pursuant to the Producer Agreement. In other words, the first sentence of paragraph 13 shows that the members promised to pay limited amounts toward the biannual installments specified in the settlement agreement. Cf. *Ulman v. Manheimer* (C.A.6, 1918), 249 F. 691, 695, where the Sixth Circuit interpreted the phrase, "Each of us agrees to be liable for our respective shares," to render the liabilities "fractional, and not unitary."

{¶ 31} The parties' intent to create several liability is further evidenced by the remaining portion of paragraph 13, which contains options available to the claimants in the event that a member fails to pay its allocated share. Specifically, that section provides that "[i]n the event that the CCR fails to make any of the payments pursuant to paragraph 5 because any one of the CCR member companies fails to make timely payment of its individual share of such payment when such payment has become due," the claimants may (1) void the settlement

agreement as to the defaulting member[10] or (2) void the settlement agreement as to all CCR members.

{¶ 32} By providing these options for the situation where a member fails to pay its individual share, paragraph 13 demonstrates that the parties believed that the agreement created individual obligations among the members and that a company's failure to tender its allocated share would result in a deficient installment payment to the claimants. As pointed out by the CCR members, interpreting the settlement agreement to provide for joint and several liability would render these options essentially meaningless, as there would be little or no impetus for claimants to pursue the defaulting member individually, especially when default is due to insolvency. And they would likewise lack incentive to void the agreement in toto and pursue the members in the tort system because, under joint and several liability, they could recover the entire settlement amount from any one of the member companies. Moreover, the latter option—voiding the agreement in its entirety—shows that the parties contemplated the situation where a significant number of CCR members default on their individual shares, presumably rendering the settlement agreement disadvantageous to the claimants.

{¶ 33} The structure of the agreement further fortifies our conclusion that the member companies promised to be liable only for their respective shares. Appendix A of the settlement agreement contains a list of all claimants whose claims were to be settled pursuant to that agreement and identifies the injured party's name, the court in which the case was filed, the alleged disease, and the settlement amount offered to each plaintiff. For each biannual installment, Kelley & Ferraro informs the CCR of those claimants who have qualified for payment in that installment, which is to be funded by the CCR in accordance with the terms of the Producer Agreement. Notably, the formula for calculating shares provides

---

10. As previously mentioned, regarding this option, the claimants may either pursue the defaulting member in the tort system or sue to enforce its obligation under the agreement.

14

that only those member companies named as defendants in a particular asbestos-related claim will be allocated a share for it.[11] Thus, the settlement agreement serves as a mechanism to resolve each plaintiff's individual claims against those member companies of the CCR responsible for his or her injury. And the member companies promised to be accountable only for their individual shares, which relate to such claims.

{¶ 34} By way of contrast, the situation here differs from that in *Wallace v. Jewell* (1871), 21 Ohio St. 163, 1871 WL 45, where several individuals signed a promissory note for $2,000, stating, "I promise to pay * * *." There, we determined that, by signing a note worded in that manner for a single sum of money, the signatories became jointly and severally liable on the note. Unlike the present case, however, *Wallace* involved an agreement with joint obligors promising to pay a single sum of money—in essence, promising the same performance; it did not contain any expression limiting the responsibilities of the obligors to certain amounts or otherwise evince an intent to create several liability for separate amounts.

{¶ 35} Section F of Attachment A of the Producer Agreement cited by the claimants does not change our conclusion that the CCR member companies promised to be liable only for their respective shares. That section provides:

{¶ 36} "In the event that a Participating Producer shall withdraw from membership in the Center pursuant to Section IV of the Agreement or have its membership terminated pursuant to Paragraph 3 of Section III, the corresponding

---

11. The Producer Agreement specifically provides: "For each Asbestos-Related Claim in which any Participating Producer is named as a defendant or a third-party defendant or is otherwise designated in the claim as responsible for the injury, that Participating Producer's Average Cost Per Closed Claim in the corresponding Occupational Grouping will be converted into an individual Liability Payment Share. For each such claim, the Liability Payment Share of each Participating Producer so named will be the ratio of its Average Cost Per Closed Claim for that Occupational Grouping to the sum of the Average Costs Per Closed Claim for that Occupational Grouping of all Participating Producers so named in that particular claim."

shares of the other Participating Producers shall be increased appropriately to pick up the shares of the withdrawing or terminating Participating Producer."

{¶ 37} Notably, paragraph 3, Section III provides that "notwithstanding termination of membership, a Participating Producer shall continue to have and to honor all of the obligations incurred by it hereunder or on its behalf as a member prior to the effective date of its membership termination, including any retroactive adjustments of its percentage shares of liability payments and allocated expenses." We recognize that the parties dispute whether, in light of the foregoing provision, Section F obligates the members to pick up a terminated company's liability share for installments due after membership termination or whether it permits the CCR to continue to allocate shares to that company.

{¶ 38} What is undisputed, however, is the provision that the Producer Agreement can be enforced only by the CCR companies, as it expressly confers no rights to third parties. Thus, any alleged breach of that agreement, such as the alleged failure to comply with Section F, can only be resolved between and among the member companies in arbitration. The claimants understood these terms and agreed to them, and they concede in their brief that the settlement agreement provides for several liability, so long as the shares have been properly and timely allocated. Any issues arising in regard to share allocation do not change the nature of the promises made by the members in the settlement agreement. Accordingly, Section F does not alter the intent of the parties to this appeal, as manifested in the settlement agreement, that liability of the member companies is limited to their individual shares.

{¶ 39} We are not unmindful of the position taken by the dissent but hasten to point out that the options available to claimants in the event of default by a member company have not only been provided for in the settlement agreement but also have been ignored by the dissent. For such a situation, the options available to the claimants include voiding the settlement agreement in its

16

entirety, voiding it as to the defaulting member and pursuing that member in tort, or suing the defaulting member to enforce its contractual obligation. As is evident, the parties anticipated a CCR member company defaulting on its individual share.

{¶ 40} The dissent asserts that the provisions of the Producer Agreement create joint and several liability among the member companies and suggests that claimants may enforce these provisions. But that view distorts the meaning of both the Producer and settlement agreements. The settlement agreement defines the rights between the member companies and the claimants, while the Producer Agreement defines the rights between and among the CCR member companies. Equally troubling is the dissent's discussion about the equities, as this case concerns legal relief and not equitable relief. Although the dissent complains that the majority's viewpoint, which it does not share, is somehow distorted, analysis of all provisions in both agreements reveals that the CCR member companies agreed to be liable only for their individual shares.

{¶ 41} To summarize, by signing the settlement agreement, the claimants understood that the members would be paying various, undisclosed amounts toward the total sum, as calculated by the formula set in the Producer Agreement—an agreement that had been in effect since 1988. And, as the settlement agreement expressly refers to the Producer Agreement, claimants knew not only about that formula, but also that the Producer Agreement expressly conferred no rights to third parties and that disputes regarding share allocation would be determined through arbitration among the members. See *Cales v. Armstrong World Industries, Inc.*, Scioto App. No. 02CA2851, 2003-Ohio-1776, 2003 WL 1798671, at fn. 12. They agreed that the CCR members would fund the installments in accordance with the terms of the Producer Agreement and that each member would be liable "only for its individual share" of such payments. Under these circumstances, the claimants cannot assert that the members assumed

joint and several liability for the settlement amount. See, generally, *Energy Acquisition Corp. v. Harbor Ins. Co.* (Sept. 4, 1990), W.D.Mich. No. G8910341 CA.[12]

{¶ 42} Based on the foregoing, we hold that the settlement agreement creates only several liability among the CCR members, and, therefore, each member is responsible only for its individual share of liability payments. Because the appellate court interpreted the agreement as providing for joint and several liability, that decision is reversed.

### Jurisdiction

{¶ 43} We are further asked to determine whether the trial court had jurisdiction to enter judgment for all 15,000 claimants against all CCR member companies in view of the fact that not all of the claimants filed suit in the Cuyahoga County Common Pleas Court and that some of the claimants who did file suit there did not name all of the CCR member companies as defendants. However, based on our decision that the settlement agreement provides for several liability as opposed to joint and several liability among the member companies and that judgments for each claimant against all CCR members cannot be upheld, we need not and do not reach this jurisdictional issue.

### Conclusion

{¶ 44} The judgment of the court of appeals is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Judgment reversed

---

12. The federal court wrote that "[a]lthough, on its face, the [settlement] contract appears to create joint and several liability, the parties' actual intentions control" and that because plaintiffs were aware that the defendants would be paying various amounts toward the total settlement amount, knew the reasons for not disclosing each defendant's individual contributions, and knew that two of the defendants were excess insurance carriers whose liability would not be at issue unless the underlying primary insurer's limits had been exhausted, the plaintiffs understood that the defendants did not intend to assume joint responsibility for the settlement amount.

and cause remanded.

MOYER, C.J., F.E. SWEENEY, LUNDBERG STRATTON and O'CONNOR, JJ., concur.

CARR, J., concurs but writes separately.

PFEIFER, J., dissents.

DONNA J. CARR, J., of the Ninth Appellate District, sitting for RESNICK, J.

_____

**CARR, J., concurring.**

{¶ 45} Although I agree with the majority's resolution on the merits of this appeal, I feel compelled to write separately to address the jurisdictional issue. It is my opinion that personal jurisdiction here was either consented to or waived by a failure to timely object.

_____

**PFEIFER, J., dissenting.**

{¶ 46} Excessive focus on a single phrase or sentence of an extensive settlement document can lead to an unbelievably distorted interpretation. Unfortunately, that is what this court has done in this case. It has chosen to focus on the last part of the first sentence of paragraph 13 of the settlement agreement. I agree that that part of the sentence suggests that CCR member companies are severally liable. In fairness, however, this court should acknowledge that there are other provisions in the settlement agreement.

{¶ 47} Paragraph five of the settlement agreement provides that CCR will make 12 payments of approximately $10,000,000 each, depending on the number of qualifying claims. This provision is straightforward: CCR is responsible for a lump-sum payment. No provision in the settlement agreement provides for payment of less than this amount. The only mention in the settlement agreement

of lesser payments is in paragraph 13, which gives the plaintiffs the discretion to declare the agreement null and void if they don't receive full payment.

{¶ 48} When read in its entirety and in the context of the settlement agreement, it is clear that the first sentence of paragraph 13 merely defers to the producer agreement the allocation of CCR member payments. Pursuant to paragraph five, payments must approximate $10,000,000. The producer agreement also makes no mention of any eventuality in which less than the full amount can be paid to the plaintiffs. It is apparent from the agreement that the plaintiffs were not concerned with which CCR members made payments, only that the payments required by paragraph five be made. It is also apparent that the CCR members agreed to pay $10,000,000 on each payment date.

{¶ 49} I understand why the individual CCR members would like to avoid covering the shares of former CCR members that have declared bankruptcy. But their own agreement covers the situation before us. Not that this court will acknowledge it. Pursuant to paragraph 2(b) of Section III of the Producer Agreement, a participating producer is terminated from the agreement upon declaring bankruptcy. The agreement does not state that consequently that participating producer's share of liability shall go unpaid. Instead, Section F of Attachment A to the Producer Agreement provides:

{¶ 50} "In the event that a Participating Producer shall * * * have its membership terminated * * *, the corresponding shares of the other Participating Producers shall be increased appropriately to pick up the shares of the * * * terminating Participating Producer."

{¶ 51} This provision answers the very question before us. The majority opinion, which mentions the provision, essentially ignores it, relying on this specious logic: "[T]he Producer Agreement can be enforced only by the CCR companies." This court should have looked at the entire agreement to determine the intent of the parties. Instead, it focused on part of one sentence and ignored

20

the inconvenient provisions that do not support its view of the case. I agree with the court of appeals, which stated:

{¶ 52} "In our effort to harmonize and to give reasonable effect to all provisions in the parties' agreement, we have concluded [that] the first sentence in Paragraph 13 of the settlement agreement, read in its entirety and in conjunction with other settlement provisions, imposes joint and several liability on the CCR members. Instead of reading this sentence as defining the members' liability *to the plaintiffs*, as the CCR members propose, we read this sentence as defining the members' liability *vis-à-vis each other*. The CCR members could have easily made themselves 'severally' bound to the plaintiffs by using that magic word, but they did not. See Corbin on Contracts §925 (Interim Ed. 2002) (The 'assumption' that the promisors mean to be bound 'jointly' can easily be overcome by adding words of 'severance.') It is rather disingenuous for the CCR members, who are sophisticated business entities and represented by able counsel, to now tout that sentence as manifestation of the parties' intent to create several liability, when that purported intent could have easily been expressed by the use of the words 'severally liable.' " (Italics sic.)

{¶ 53} This court is being similarly disingenuous in focusing on part of one sentence while essentially ignoring Section F of Attachment A to the producer agreement and the overall context of Paragraph 13 of the settlement agreement.

{¶ 54} The majority opinion suggests that the equities favor the producers. Let's be serious. Even aside from the grievous health issues that the plaintiffs, not the producers, suffer, the producers are the parties that have violated the settlement agreement. The producers defaulted. There is no provision for partial payments. The producers made a partial payment in December 1999. There is no provision for no payment. The producers made no payment in December 2001 or thereafter. The producers should have submitted full payment and requested the

court to escrow the disputed amount. Furthermore, the producers still haven't fixed the December 1999 payment schedule among themselves, which also violates the settlement agreement. Concluding that the equities favor the producers is difficult to comprehend.

{¶ 55} Finally, the majority states that the jurisdictional issue is moot. It would be better to state the obvious, that the lower court had jurisdiction because the parties entered into an agreement and asked the court to determine certain aspects of it. I dissent.

_____

Jones Day, Patrick F. McCartan, Mark Herrmann, and Mary Beth Young, for appellants Pfizer, Inc., Quigley Company, Inc., and Dana Corp.

Vorys, Sater, Seymour & Pease, L.L.P., David S. Cupps and Richard D. Schuster, for appellants Amchem Products, Inc., CertainTeed Corp., Dana Corp., I.U. North America, Inc., Maremont Corp., National Service Industries, Inc., Nosroc Corp., and Union Carbide Corp.

Cooper & Walinski, L.P.A., and Richard S. Walinski, for appellant Dana Corp.

The Zagrans Law Firm Co., L.P.A., and Eric H. Zagrans; Marcus, Santoro & Kozac, P.C., Frank J. Santoro, Karen M. Crowley, and John M. Ryan Jr., for appellant C.E. Thurston & Sons, Inc.

Kelley & Ferraro, L.L.P., Michael V. Kelley and Thomas M. Wilson; Hahn Loeser & Parks, L.L.P., Robert J. Fogarty, Andrew S. Pollis, and Yuri R. Linetsky, for appellees.

Bricker & Eckler, L.L.P., Kurtis A. Tunnell, Anne Marie Sferra, and Vladimir P. Belo, urging reversal for amici curiae, Ohio Manufacturers' Association, Ohio Chapter of National Federation of Independent Business, and Ohio Chemistry Technology Council.

_____